The Zorro Tobacco Co., Inc. v. Commissioner.
Zorro Tobacco Co. v. Commissioner
Docket No. 414 P.T.
United States Tax Court
1943 Tax Ct. Memo LEXIS 370; 2 T.C.M. (CCH) 21; T.C.M. (RIA) 43159; April 6, 1943
*370 Albert A. Jones, Esq., for the petitioner. Breedlove Smith, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: This proceeding was brought to review the disallowance by the respondent of the petitioner's claim filed under Title VII of the Revenue Act of 1936 for refund of processing tax in the amount of $3,611.02. The issue involved is whether the petitioner bore the burden, in whole or in part, of any amount which it paid as processing tax under the Agricultural Adjustment Act and, if so, to what extent it bore such burden. This proceeding came on for hearing, the Presiding Officer being a Member of the Processing Tax Board of Review, who thereupon prepared proposed findings of fact which were submitted to the parties. At that point the proceeding was transferred from the Board of Review to The Tax Court of the United States, pursuant to section 510 of the Revenue Act of 1942. Findings of Fact 1. The petitioner is a corporation with its principal place of business located at 401 No. Pecos Street, San Antonio, Texas. Since its inception in November, 1914, to the present time, petitioner has been engaged in the processing of tobacco at its factory *371 in San Antonio, Texas. 2. The petitioner paid processing taxes on the first domestic processing of tobacco during the period from October 1, 1933, to November 30, 1935, in the amount of $3,611.02. 3. On December 8, 1939, the petitioner filed with the collector of internal revenue, Austin, Texas, a claim for refund of processing tax paid under Title VII of the Revenue Act of 1936, in the amount of $3,611.02. Notice of the disallowance, in full, of the claim by respondent was sent to the petitioner by registered mail on September 19, 1941. A petition for review of such disallowance was filed with the Board of Review on December 16, 1941. 4. The petitioner manufactured two kinds of smoking tobacco, granulated and leaf, in which the entire tobacco leaf, including stem, was used. Its products were sold in packages of various sizes to dealers who sold them mostly to Mexicans in Texas. 5. Since the beginning of the business, petitioner has used one type or quality of tobacco, namely, fire-cured, heavy-bodied, long broad leaf tobacco grown in the Paducah, Hopkinsville, and Mayfield districts of Kentucky. All purchases of tobacco have been made from leaf dealers at market prices. The tobacco *372 comes in hogsheads in which it has been packed under heavy pressure with sufficient moisture content to darken the tobacco during the aging of such tobacco. When the tobacco is removed from the hogsheads, it is very wet and it is necessary to hang it out to dry before it is in processing order. When there has been a shrinkage in weight of from 20 to 25 percent due to the moisture drying out, the tobacco is then processed. The weight after the shrinkage, due to drying out, was the weight reported in the processing tax returns and on which the tax was paid. There is no loss in weight in processing as all of the leaf is used. The shorter leaf and any broken leaves are used in the granulated tobacco, while the long, whole leaves are used in the leaf tobacco products. The processing of the leaf tobacco consists of folding the leaves into a tube-shaped package which is wrapped in paper on which the name of the brand appears. Some sugar is used in the casing material added to the tobacco ground into granulated smoking tobacco but the whole leaf is used. At no time are any of the stems removed. 6. The brands, sizes, list price, the per pound price, and trade and cash discounts allowed during *373 both the tax period and the period before and after the tax are as follows: GRANULATED
List
Trade
price per
and cash
Brand
Size
gross
Per lb.
discounts
Lobo
7/8 oz.
$11.52
$1.46
10% & 2%
Charro
1 oz.
11.52
1.28
10% & 2%
Charro
1/2 oz.
5.76
1.28
10% & 2%
LEAF
Pato
7/8 oz.
5.76
.73
10% & 2%
Pato
1 3/4 oz.
11.52
.73
10% & 2%
Pato
4 oz.
.58
10% & 2%
Pato
8 oz.
.58
10% & 2%
Wolf
1 oz.
5.76
.64
10% & 2% These prices have been the same since the beginning of the business, except with respect to the 4-ounce and 8-ounce packages of "Pato," which were reduced from 60 cents per pound to 58 cents per pound before the beginning of the pre-tax period. 7. The number of units of the commodity processed in the tax period, on which the tax was paid, the gross sales value of the articles produced, the cost of the tobacco, and the computation of the statutory margin are as follows: Units
118,742
Gross Sales Value
$131,380.44
Cost of Commodity
$24,899.21
Tax
3,611.02
28,610.22
Margin
$102,870.21
Average margin per unit
$0.888786944
8. The number of units processed in the period before and after the tax, *374 the gross sales value of the articles produced, the cost of the tobacco, and the computation of the statutory margin are as follows: Units
91,616
Gross sales value
$101,877.71
Cost of commodity
22,421.25
Margin
$ 79,456.46
Average margin per unit
$0.867277113 The presumptive margin against petitioner on the prima facie case is $0.021511831 per unit, or $2,489.82. 9. Petitioner held in inventory on October 1, 1933, 54,390 pounds of raw tobacco. The finished product equivalent of the 54,390 pounds of raw tobacco in inventory on October 1, 1933, is 41,636 pounds, calculated at 76.55 percent of the raw weight of such product. 10. The cost of petitioner's October 1, 1933, inventory was $9,582.49, with a per unit cost of $.230149150 ($9,582.49 / 41,636). The per unit cost of the base period tobacco was $.244730723 ($22,421.25 / 91,616). The difference between the two is $.014581573, which is the amount per unit by which the cost of tobacco in the opening inventory for the tax period was lower than the cost of tobacco processed in the base period. 11. The aggregate decrease in cost of the commodity held by petitioner in the October 1, 1933, inventory and processed by *375 the petitioner during the tax period from the cost of commodity processed during the base period is $607.12 (41,636 X.014581573). This decrease in cost is not attributable to the tax, and petitioner is entitled to a favorable per unit adjustment in the amount of $.005245460 ($607.12 / 115,742) therefor. 12. The kind, size, sales value per pound, total pounds of each product processed, gross sales value of the various tobacco products processed during both the tax period and the period before and after the tax, and the percentage of each brand produced to the total, are shown in the following tables: Sales
Kind
Size
Values
Weight
Gross Sales
% to
Per Lb.
Processed
Value
Totals
Tax Period (10/1/33 to 11/30/35)
Lobo
7/8 oz.
$1.46
53,764
$ 78,495.44
59.747
Charro
1 oz.
1.28
5,866
7,508.48
5.715
Charro
1/2 oz
1.28
10,039
12,849.92
9.781
Pato
7/8 oz.
.73
30,500
22,265.00
16.947
Pato
1 3/4 oz.
.73
6,252
4,563.96
3.474
Pato
4 oz.
.58
3,600
2,088.00
1.589
Pato
8 oz.
.58
2,250
1,305.00
.993
Wolf
1 oz.
.64
3,601
2,304.64
1.754
Total
$131,380.44
Base Period (10/1/32 to 9/30/32 and 2/1/36 to 7/31/36)
Lobo
7/8 oz.
$1.46
42,037
$ 61,374.03
60.243
Charro
1 oz.
1.28
3,085
3,948.80
3.876
Charro
1/2 oz.
1.28
7,404
9,477.12
9.302
Pato
7/8 oz.
.73
21,785
15,903.05
15.610
Pato
1 3/4 oz.
.73
6,724
4,908.52
4.818
Pato
4 oz.
.58
3,400
1,972.00
1.936
Pato
8 oz.
.58
2,350
1,363.00
1.338
Wolf
1 oz.
.64
4,580
2,931.20
2.877
Total
$101,877.72
*376 Petitioner accordingly produced a larger percentage of the higher-priced tobaccos during the tax period than in the base period, which resulted in a higher gross sales value per unit for the tax period. The tax period gross sales value per unit was $1.135114651 ($131,380.44 / 115,742 * ), while the base period value per unit was $1.11200783 ($101,877.71 / 91,616 * ) or a higher tax period gross sales value per unit of $.023106821, which amounts to a total of $2,674.43 (115,742 X.023106821) for the tax period. The excess of the gross sales value in the tax period over that of the base period is attributable to the stated extent of $2,674.43 to the larger percentage of the higher-priced tobacco produced during the tax period and to that extent is not attributable to the tax. 13. The method of purchasing raw tobacco was not changed during the tax period, and there was no material change in the other costs of manufacture during the *377 tax period. The tax was never invoiced or shown separately. Petitioner made no change in its merchandising practice in the tax period. It has no agreement or understanding, oral or written, whereby it may be relieved of the burden of the tax or reimbursed therefor. 14. Petitioner bore the burden of processing tax not passed on to the extent of.006840450 per unit, or a total of $791.73, the unfavorable presumption in the aggregate amount of $2,489.82 having been overcome by the two rebuttal factors totaling $3,281.55, as shown by the following table: Total
Per Unit
for 115,742 units
Presumptive Margin
.021511831
$2,489.82
Rebuttal
Lower Tax Period Cost
.005245480
607.12
Excess Tax Period
Sales Value
.023106821
2,674.43
Total
.026352281
3,281.55
Burden Borne
.006840450
$ 791.73
Opinion The record in this case as it comes to us includes certain proceedings in the Processing Tax Board of Review before which it was originally instituted. Proposed findings of fact were prepared by the Presiding Member who conducted the hearing, and, in accordance with its procedure, the Board of Review communicated these proposed findings to the parties *378 and gave them an opportunity to register any objections. No questions were raised by the petitioner and a considerable portion of the preliminary findings were not objected to by respondent in the brief filed by him. We are not unmindful of the responsibility of decision which rests upon us by virtue of the transfer of the jurisdiction over these proceedings. Nevertheless, it seems not unreasonable to leave substantially undisturbed those proposed findings which have not been brought into question by either party, and we have accordingly accepted them as in the nature of agreed facts without necessarily passing independent judgment upon the evidence. They are embodied in the foregoing findings numbered 1 through 8. From these it appears that the statutory margin is unfavorable to the petitioner. Its contention that the resulting presumption has been overcome by two rebuttal factors is the extent of the controversy which remains. We have recorded our independent findings as to these factors and our finding of ultimate fact of the extent to which they result in the amount of tax which may be refunded for the reason that the burden thereof has been borne by petitioner. Concerning the *379 adjustment in gross sales value to which petitioner claims to be entitled by reason of the higher percentage of high-priced articles processed in the tax period, the result based purely on figures already in the record is no more than mathematical computation, the basis of which we have set forth sufficiently in the findings. Respondent does not appear to disagree with the theory upon which allowance for this element is made in petitioner's favor. The remaining adjustment which rests upon the lower raw material cost of articles processed during the tax period is justified by , the authority exclusively relied upon by both parties. It is the interpretation of that decision which causes the controversy between them. A study of that case and reference to the basic statute have led us to the conclusion adopted in our findings that the extent to which petitioner is entitled to be given consideration for the element of reduced cost is the inventory on hand at the beginning of the tax period. Revenue Act of 1936, section 902 (a) (2), forbids the allowance of any refund to the extent that *380 the taxpayer failed to bear the burden of the tax "through reduction of the price paid for any such commodity." This must be limited as a result of the Regensburg case to exclude instances where the petitioner can demonstrate that his increased profit resulting from a decrease in the "cost of the raw material * * * during the 'tax period' * * * was not 'due' to the tax * * *." In that case all of the raw material processed during the tax period was purchased before it commenced, and was in the taxpayer's inventory when that period opened. It is not difficult to infer from such circumstances that the tax, which was not in existence when the tobacco was purchased, could not have been passed back to the producer. We have accordingly found that the decreased cost of all of petitioner's tobacco on hand at the beginning of the tax period and processed therein is available to it to overcome the presumption. The same thing does not hold true, however, of tobacco purchased during the tax period. The burden of proof, and of dispelling possible inferences unfavorable to it, is upon petitioner. Prices of commodities bought after the tax became effective were fixed with knowledge of the *381 various economic factors operating as a result of tax and the correlative benefit payments. There is no inherent impossibility that purchases could have been made at lower prices as a result of the tax and for the purpose of off-setting it. Petitioner made no effort to introduce evidence to establish that the decrease in price was unconnected with the tax, assuming that it could be heard to do so under the circumstances. See . The mere fact that it maintained the same purchasing methods and bought at market price constitutes no such proof any more than a rise in the selling price could be explained merely by reference to a rise in the general market. . In the absence of substantiating evidence, therefore, we are unwilling to assume that petitioner may not have escaped the burden of the tax "through reduction of the price paid for any such commodity" by depressing the purchase price of the commodity acquired during the tax period. Decision will be entered for the petitioner in *382 the amount of $791.93. Footnotes
*. This total does not agree exactly with the total of the figures in the above table, but it is the figure found by the Board of Review and apparently accepted as correct by both parties and has accordingly been found here (see findings 7 and 8 above).↩